UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AMERIPRISE CAPTIVE INSURANCE
COMPANY, as subrogee of IDS PROPERTY
CASUALTY INSURANCE COMPANY,

　　　　　　　　　　　Plaintiff,

-against-

AUDATEX NORTH AMERICA, INC.,

　　　　　　　　　　　Defendant.

---

Case No. 1: 22-cv-05964 (JLR)

**<u>OPINION AND ORDER</u>**

JENNIFER L. ROCHON, United States District Judge:

　　　　Plaintiff Ameriprise Captive Insurance Company ("Ameriprise" or "Plaintiff") brings this action against Defendant Audatex North America, Inc. ("Audatex" or "Defendant"), alleging that Audatex breached its contractual obligations to indemnify the cost of defending and settling another lawsuit, *Zuern v. IDS Prop. Cas. Ins. Co.*, No. 19-cv-06235, 2021 WL 735751 (W.D. Wash. Feb. 25, 2021) (the "*Zuern* Decision"), and to carry certain insurance.  Dkt. 1 ("Compl."). This Court dismissed the Complaint, *see Ameriprise Captive Ins. Co. v. Audatex N. Am., Inc.* ("*Ameriprise I*"), 675 F. Supp. 3d 340 (S.D.N.Y. 2023), and on May 23, 2024, the Second Circuit Court of Appeals vacated this Court's dismissal and remanded the case for further proceedings consistent with its order.  *Ameriprise Captive Ins. Co. v. Audatex N. Am. Inc*. ("*Ameriprise II*"), No. 23-957, 2024 WL 2350315 (2d Cir. May 23, 2024) (summary order).

　　　　Now before this Court is Defendant's second motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6).  Dkt. 48 ("Mot.").  For the reasons set forth below, the Court DENIES Defendant's motion to dismiss.

## BACKGROUND[1]

The Court generally assumes the parties' familiarity with Plaintiff's allegations, as recounted in *Ameriprise I*.  The Court provides only a brief summary below.

### IDS and Audatex's Agreement[2]

In October 2011, Audatex and IDS entered into an Application Service Provider Agreement (the "Agreement") whereby Audatex agreed to provide certain software and services to IDS.  Compl. ¶¶ 15-16; *see* Dkt. 24-1 ("Agreement").[3]  The Agreement included Audatex's "Autosource" vehicle-valuation software.  Compl. ¶ 19.  IDS used Autosource to calculate the value of a vehicle when an insured submitted a claim for the total loss of their vehicle.  Compl. ¶ 19.  Audatex's Autosource tool applied a "Typical Negotiation Adjustment" ("TNA") to the total cash value for vehicles.  Compl. ¶ 20.  The TNA reduced the total cash value of a vehicle based on the assumption that buyers are often able to negotiate down the advertised price for a vehicle when purchasing from a dealership.  Compl. ¶ 20.  The TNA applied by Autosource typically reduced the value of a vehicle by approximately 6 to 7 percent.  Compl. ¶ 21.

---

[1] Unless otherwise noted, the facts stated herein are taken from the Complaint, which the Court accepts as true, and material referenced in the Complaint.  *See In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 176 (2d Cir. 2013); *accord ONY, Inc. v. Cornerstone Therapeutics, Inc*., 720 F.3d 490, 492 (2d Cir. 2013).

[2] Ameriprise provided insurance coverage to its affiliate, IDS, for purposes of the *Zuern* litigation.  Compl. ¶¶ 1, 47.  Under the parties' insurance policy, Ameriprise is "subrogated to the rights of IDS" and is therefore entitled to pursue IDS's breach of contract claim.  Compl. ¶ 47.

[3] The Court can consider the Agreement on the instant motion because it is incorporated by reference into the Complaint.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (stating that a court may "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, . . . and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit").

The Agreement contains an indemnification provision, providing in relevant part that:

> 20.1 Vendor Indemnity.  Notwithstanding any other provision herein, [Audatex] agrees to defend, at its own expense, any claim, suit, action or proceeding brought against Ameriprise or its Affiliates, and each of their respective directors, officers, employees and agents (collectively, "Indemnitees") and shall indemnify and hold Indemnitees harmless from and against any and all claims, judgments, awards, demands liabilities, costs, damages, or expenses (including reasonable attorneys' fees and costs of settlement) (collectively, "claims"), resulting from or arising out of:

> 20.1.1 the System, Services, Content (**specifically excluding Ameriprise Content**), or any work product provided by [Audatex] hereunder, or the use thereof; and/or

> 20.1.2 any third party claims arising out of [Audatex]'s representations, warranties, covenants, or other obligations under Sections 10.3 ("Information and Physical Security"), 12.2 ("Legal Compliance"), 12.3 ("Policy Compliance"), and/or Articles 15 ("Encryption Export") or 18 ("Representation, Warranties, and Covenants").

Agreement § 20.1 (boldface added for emphasis) (emphases in original omitted).  On remand, the parties dispute the scope and meaning of the indemnification provision's carveout for "Ameriprise Content" highlighted above.

The Agreement further defines "System" and "Content" as follows:

> "Content" means any and all content and data included within the System, including market data, security valuations, corporate actions, and any other information related to securities and accounts. . . .

> "System" means [Audatex's] computer and related hardware, hardware configurations, operations systems and related firmware, proprietary software and other software and related algorithms, and other data and facilities (including Internet connectivity, as applicable) required to enable Ameriprise Users to use the Services, together with any modifications, enhancements, and updates thereto.

Agreement sched. 1.0 (emphases omitted).  "Services" are defined in Section 3.1 of the Agreement:

> 3.1 Services. Commencing on the Effective Date, [Audatex] shall provide to Ameriprise the services (including the Hosting Services and the Support and/or Maintenance Services), functions and responsibilities described in the applicable

> Statement of Work and all attachments thereto, as they may evolve, be supplemented, enhanced, modified or replaced in accordance with this Agreement (collectively, and including the System, the "Services").

Agreement § 3.1 (emphasis omitted).   The Agreement also specifically defines "Ameriprise Content" as follows:

> "Ameriprise Content" means content and data created, produced and developed (or otherwise owned) by Ameriprise and its Affiliates (including any Ameriprise-owned trademark or service mark authorized for use by Vendor), together with content and data licensed or acquired by Ameriprise from third party content providers.

Agreement sched. 1.0 (emphasis omitted).  Pursuant to Section 5.2 of the Agreement, Ameriprise granted Audatex a license to "use the Ameriprise Content . . . solely for the purpose of, and only to the extent necessary for, [Audatex] to develop, implement, and operate [Audatex's] Services in accordance with" the Agreement.  Agreement § 5.2.  Ameriprise also assumed "exclusive responsibility" for: "(i) the consequences of any instructions Ameriprise gives to [Audatex]; (ii) Ameriprise's failure to properly [a]ccess or use the Services in accordance with this Agreement; and (iii) Ameriprise's failure to supply accurate Content."  Agreement § 5.11.

Audatex further agreed to indemnify Ameriprise against any third-party claims arising out of Audatex's representations, warranties, and covenants under the Agreement.  Agreement § 20.1.2.  This included Audatex's representations and warranties that it would "comply with all applicable federal, state, local, and foreign rules, laws, and regulations in the performance of its obligations hereunder, including the Foreign Corrupt Practices Act, the Gramm-Leach-Bliley Act, the Sarbanes Oxley Act, Regulation SP, Payment Card Industry – Data Security Standards, and Massachusetts 201 C.M.R. sections 17.00-17.04."  Agreement § 18.1.7; *see* Agreement § 20.1.2.  Audatex must also "carry certain insurance as described in Section 24 and Schedule 8.0."  Compl. ¶ 44.  Section 24 provides that Audatex shall maintain "the types and minimum

levels of insurance coverage specified in Schedule 8.0." Agreement § 24.1. Schedule 8.0 in turn enumerates nine different types of insurance, including coverage for employee fidelity bonds, professional liability/errors and omissions, workers' compensation, employer's liability, commercial general liability insurance, medical payments, commercial auto liability, umbrella/excess liability, and electronic data processing/privacy and network security insurance. *See* Agreement sched. 8.0.

Finally, the Agreement contains a choice-of-law clause selecting New York law. *See* Agreement § 25.6.

### The *Zuern* Litigation

In November 2019, auto-insurance customers brought a class-action lawsuit against IDS alongside IDS' affiliates Ameriprise Insurance Company and Ameriprise Auto & Home Insurance (the "*Zuern* Litigation"). Compl. ¶¶ 22-23; *see generally* Dkt. 1-1 ("*Zuern* Compl.").[4] The suit alleged that IDS "[used] improper adjustments to reduce insureds' total loss valuations and claims payments in violation of Washington law and [IDS's] contractual obligations" under its insurance contracts. *Zuern*, 2021 WL 735751, at *1.[5] The *Zuern* Plaintiffs asserted that Ameriprise's valuation of insureds' vehicles was "based on an AudaExplore market valuation report" that listed values of comparable vehicles sold or for sale in the same geographic area as the insured. *Zuern* Compl. ¶¶ 19, 25. According to the *Zuern* Plaintiffs, "Ameriprise instruct[ed] AudaExplore as to what specific data to include in the report as the basis for the

---

[4] The Court may consider the *Zuern* decision and the *Zuern* Complaint on the instant motion because the Complaint attaches the *Zuern* Complaint and otherwise incorporates both documents by reference. *See supra* note 3.

[5] Similar claims have been brought against other insurance companies that relied upon Audatex's system and services. *See, e.g.*, Dkt. 52 ("Opp.") at 9 n.2 (collecting cases).

valuation, including whether to include a 'typical negotiation' adjustment to the comparable vehicles." *Zuern* Compl. ¶ 19.  As a result, Autosource "applied a [TNA]" when running its valuation reports.  *Zuern* Compl. ¶ 25.  The *Zuern* Plaintiffs pleaded that, as a general business practice, Ameriprise impermissibly "offer[ed] its insureds a claim amount equivalent to the valuation of the loss vehicle that is specified in the market valuation report prepared by third-party AudaExplore."  *Zuern* Compl. ¶ 20.

In December 2020, IDS settled the *Zuern* Litigation.  Compl. ¶ 28.  IDS and Ameriprise ultimately paid a total of approximately $2,500,000 to defend and resolve the *Zuern* Litigation.  Compl. ¶ 35.

IDS twice demanded that Audatex indemnify it for all costs related to the lawsuit.  Compl. ¶¶ 41, 43.  Audatex declined to do so.  Compl. ¶¶ 41, 43.  IDS further requested that Audatex "provide the contact information for the insurance carrier that issued the required coverage" under Section 24 and Schedule 8.0 of the Agreement.  Compl. ¶¶ 44-45.  Audatex did not provide proof of such coverage in response to Plaintiff's request.  Compl. ¶ 46.

### Procedural History

Plaintiff filed the Complaint in this action on July 13, 2022.  Dkt. 1.  The Complaint asserts a single count for breach of contract, alleging that Defendant breached the Agreement by refusing to defend and indemnify against the *Zuern* Litigation and failing to obtain insurance coverage required by the Agreement.  *Id.* ¶¶ 48-57.  On May 30, 2023, this Court dismissed the lawsuit.  *See generally Ameriprise I*, 675 F. Supp. 3d 340.  The Court concluded that the indemnification provision at Section 20.1 did not apply because the *Zuern* litigation "resulted or arose out of [Ameriprise's] conduct and [Ameriprise's] failure to comply with laws affecting its business," not from Ameriprise's use of Audatex's services.  *Id.* at 349-50.  In so holding, this

Court relied upon the allocation of responsibilities between the parties elsewhere within the Agreement, including Ameriprise's assumption of responsibility for the consequences of any instructions given to Audatex, Agreement § 5.11, and for compliance with laws and regulations affecting Ameriprise's business, Agreement § 25.26.1. *Ameriprise I*, 675 F. Supp. 3d at 348. The Court also separately dismissed Plaintiff's claim premised on Defendant's failure to obtain insurance, holding that the Complaint failed to adequately plead either breach or damages in support of that theory. *Id.* at 353-54.

On May 23, 2024, the Second Circuit vacated the judgment of this Court and remanded the case for further proceedings consistent with its order. *See generally Ameriprise II*, 2024 WL 2350315. The Second Circuit addressed only the threshold showing necessary to trigger Section 20.1 of the parties' contract, whereby "[n]otwithstanding any other provision herein," Audatex must indemnify Ameriprise for claims "resulting from or arising out of . . . the System, Services, Content (specifically excluding Ameriprise Content), or any work product provided by [Audatex] hereunder, or the use thereof," Agreement § 20.1. *See Ameriprise II*, 2024 WL 2350315, at *2. The Second Circuit held that Plaintiff had pleaded facts "sufficient to establish that the *Zuern* claims resulted from or arose out of Ameriprise's use of Audatex's valuation tool." *Id*. at *3. The Second Circuit further held that Audatex's valuation tool need not have been the "proximate cause" of the *Zuern* claims; it was sufficient that Ameriprise had plausibly alleged "some causal relationship" between Audatex's services and the *Zuern* claims against Ameriprise. *Id.* (citation omitted). The court found that, to the extent the indemnification provision conflicted with other provisions in the Agreement, the indemnification provision's "notwithstanding" clause "trump[ed] any conflicting terms in the contract." *Id.*

The Second Circuit was explicit, however, that its holding was a limited one: "We express no opinion on the question of whether the indemnification provision requires Audatex to indemnify Ameriprise from the *Zuern* claims, given the other terms of the provision, including its carve out for 'Ameriprise Content.'" *Id.* At oral argument, Judge Sullivan likewise alluded to Section 20.1's carveout for "Ameriprise Content," stating that:

> It would seem to me that Audatex's argument would be that information or content included in the system that relates to [] state-law compliance, well that falls under the heading of Ameriprise Content and is therefore excluded from the otherwise incredibly broad indemnification provision. That would seem to be the straightforward and textual way to resolve this.

Arg. at 12:43-13:15.[6]  This comment was made prior to the clarification at oral argument that "Ameriprise Content" was a defined term under the Agreement.  *Id.* at 13:18-37.

After the case was remanded, on July 15, 2024, Audatex filed a second motion to dismiss the Complaint pursuant to Rule 12(b)(6), relying primarily on the Ameriprise Content carveout highlighted by the Second Circuit.  Mot.  On August 15, 2024, Ameriprise filed its opposition, Dkt. 52 ("Opp."), and on September 5, 2024, Audatex filed its reply, Dkt. 54 ("Reply").  The Court held oral argument on January 7, 2025.[7]

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 680 (2009)).  The Court draws all reasonable inferences in the plaintiff's favor and accepts

---

[6] *See Oral Argument for Ameriprise Captive Insurance Company v. Audatex North America, Inc.*, Court Listener, https://www.courtlistener.com/audio/90521/ameriprise-captive-insurance-company-v-audatex-north-america-inc/ (last visited Jan. 11, 2025).

[7] Citations to "Tr." refer to the January 7, 2025 oral argument transcript.

as true all non-conclusory allegations of fact.  *Id.*  However, a complaint must allege "more than a sheer possibility that a defendant has acted unlawfully" and more than "facts that are 'merely consistent with' a defendant's liability."  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  Determining whether a complaint states a claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.

On a motion to dismiss, a court may "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, . . . and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc.*, *v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also Fawn Second Ave. LLC v. First Am. Title Ins. Co.*, 610 F. Supp. 3d 621, 628 (S.D.N.Y. 2022) (the "narrow universe" of materials a court may consider on a motion to dismiss includes "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint" (quoting *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021))).  "Where a document is referenced in a complaint, 'the documents control and this Court need not accept as true the allegations in the . . . complaint.'"  *Tongue v. Sanofi*, 816 F.3d 199, 206 n.6 (2d Cir. 2016) (quoting *Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000)).

To state a claim for breach of contract under New York law, a party must allege: (i) the existence of a contract; (ii) performance of the contract by one party; (iii) breach by the defendant; and (iv) damages attributable to that breach.  *Beautiful Jewellers Private Ltd. v. Tiffany & Co.*, 438 F. App'x 20, 21-22 (2d Cir. 2011) (summary order).

## DISCUSSION

Defendant moves for a second time to dismiss Plaintiff's breach of contract claim. Defendant now invokes the "Ameriprise Content" carveout at Section 20.1.1, which states that Audatex will indemnify Plaintiff for all claims "resulting or arising out of: 20.1.1 the System, Services, Content (**specifically excluding Ameriprise Content**), or any work product by [Audatex] hereunder, or the use thereof." Agreement § 20.1.1 (emphasis added). Defendant argues that the carveout applies to the *Zuern* claims and therefore defeats Plaintiff's claim for a breach of the indemnification provision. Mot. at 11-20. Defendant separately argues that Plaintiff's other contractual theories — including that Audatex owed a duty to indemnify under Section 20.1.2 and that Audatex failed to obtain insurance as required under the Agreement — are not at issue on remand and, in any event, fail on the merits. *Id.* at 20-25. The Court addresses each of these points in turn.

### A. Legal Standard

Under New York Law, "[w]hen a claim is made that a duty to indemnify is imposed by an agreement, that agreement must be strictly construed so as not to read into it any obligations the parties never intended to assume." *Haynes v. Kleinewefers & Lembo Corp.*, 921 F.2d 453, 456 (2d Cir. 1990). To survive a motion to dismiss under this strict standard, an agreement must "demonstrate an 'unmistakable intent' to indemnify the negligent party" for the expenses at issue. *Exxon Mobil Corp. v. Tredegar Corp.*, 891 F. Supp. 2d 559, 562 (S.D.N.Y. 2012) (quoting *Haynes*, 921 F.2d at 456). Therefore, an "indemnity clause must reflect the unmistakable intent of the parties as to the scope of its coverage." *Schiavone Const. Co. v. Nassau County*, 717 F.2d 747, 751 (2d Cir. 1983) (citation omitted). "A party's right to contractual indemnification depends upon the specific language of the relevant contract."

*Campisi v. Gambar Food Corp*., 13 N.Y.S.3d 567, 568 (App. Div. 2015).  A "contract that provides for indemnification will be enforced as long as the intent to assume such a role is sufficiently clear and unambiguous." *Bradley v. Earl B. Feiden, Inc*., 864 N.E.2d 600, 605 (N.Y. 2005) (citation and quotation marks omitted).

### B.  Analysis of Breach of Section 20.1.1

The Second Circuit has now held that the *Zuern* claims trigger the broad indemnification provision at Section 20.1.1 — notwithstanding any other provision in the Agreement — because they "resulted from or arose out of" Ameriprise's use of Audatex's valuation tool and services. *Ameriprise II,* 2024 WL 2350315, at *3 & n.2.  This is where the Court must start on remand. The question now before this Court, based on Audatex's new motion to dismiss, is whether, based on the facts pleaded, the *Zuern* claims "resulted from or arose out of" Ameriprise Content such that Section 20.1.1's limited carveout exempts Audatex from any obligation to indemnify. *Id.* at *3.  Defendant urges that the carveout applies and that Plaintiff's claim premised on a breach of the indemnification provision is therefore deficient as a matter of law.  For the reasons set forth below, the Court disagrees.

As a threshold matter, the Court finds that, contrary to Plaintiff's suggestion, Audatex's motion to dismiss is properly before the Court.  Audatex's motion is neither impermissibly "successive" nor "waived."  Opp. at 1 n.1.  Although Rule 12 "bars successive motions premised on the differing defenses listed in Fed. R. Civ. P. Rule 12(b)(2)-(5), it does not necessarily prevent additional 12(b)(6) motions containing differing arguments."  *Indig v. Village of Pomona*, No. 18-cv-10204 (PMH), 2021 WL 3773653, at *3 (S.D.N.Y. Aug. 24, 2021) (citation and quotation marks omitted).  "Courts in this District have therefore held that successive Rule 12(b)(6) motions are not procedurally improper."  *Ballast v. Workforce7 Inc*., No. 20-cv-03812

(ER), 2024 WL 307966, at *5 (S.D.N.Y. Jan. 25, 2024) (collecting cases); *see also ADMIntermare v. Kamca Trading S.A.*, No. 20-cv-01223 (JPO), 2022 WL 845593, at *2 (S.D.N.Y. Mar. 22, 2022) (considering merits of second motion to dismiss "[i]n the interest of judicial economy" and because there was "no evidence that [plaintiff] acted with dilatory intent").[8]  The Court agrees with Audatex that judicial economy is served by allowing Audatex to bring this motion, particularly because the Second Circuit raised the issue of the carveout *sua sponte* and highlighted it on remand.

Nor is Audatex's motion foreclosed by the Second Circuit's mandate.  Plaintiff contends that the Second Circuit has already "unmistakably" held that Ameriprise "stated a plausible claim for indemnification for the *Zuern* lawsuit."  Opp. at 1.  This misconstrues the Second Circuit's limited holding.  The Second Circuit held only that "the district court erred in concluding that Ameriprise failed to plead facts sufficient to establish that the *Zuern* claims resulted from or arose out of Ameriprise's use of Audatex's valuation tool."  *Ameriprise II*, 2024 WL 2350315, at *3.  The court was explicit that it was "express[ing] no opinion on the question of whether the indemnification provision requires Audatex to indemnify Ameriprise for the *Zuern* claims, given the other terms of the provision, including the carveout for 'Ameriprise Content.'"  *Id.* at *3.

Plaintiff nonetheless maintains that, had Rule 12(b)(6) dismissal been appropriate based on the carveout, the Second Circuit would have affirmed this Court on those grounds and that its

---

[8] Plaintiff's cited authority acknowledges as much.  *In re Row NYC, LLC* observed that the "Southern District of New York has explicitly recognized that many courts have interpreted Rule 12(g) permissively, observing that, in 'the interest of judicial economy,' there is 'no reason' to require a party to 're-brief its arguments in the form of a motion for judgment on the pleadings or for summary judgment,' when the outcome of such a motion is already resolved by another aspect of the court's ruling."  No. 23-cv-10015 (JLG), 2024 WL 61915, at *11 (Bankr. S.D.N.Y. Jan 4, 2024) (quoting *ADMIntermare*, 2022 WL 845593, at *2).

failure to do so is therefore telling.  Opp. at 10.  But that the Second Circuit "*may* affirm on any grounds for which there is a record sufficient to permit conclusions of law, including grounds not relied upon by the district court," does not mean that it is under any obligation to do so.  Opp. at 10-11 (emphasis added) (quoting *Olsen v. Pratt & Whitney Aircraft, Div. of United Techs. Corp.*, 136 F.3d 273, 275 (2d Cir. 1998)).  In fact, it made good sense for the Second Circuit not to reach the issue of the Ameriprise Content carveout given that, at the time of the appeal, neither party had briefed the issue either before the District Court or before the Second Circuit on appeal.  It was therefore appropriate for the Second Circuit to remand for consideration of the matter by the District Court "in the first instance."  *United States v. Garcia*, 56 F.3d 418, 424 (2d Cir. 1995) (vacating and remanding on issue to be "addressed by the district court in the first instance"); *see also Johnson v. Wright*, 412 F.3d 398, 406 n.4 (2d Cir. 2005) (choosing "not to consider" alternative grounds not considered by the district court and "express[ing] no opinion as to their appropriate disposition").  That question is now before this Court.

Turning then to the merits, the parties dispute the scope of the Ameriprise Content carveout.  Ameriprise argues that because the indemnification provision is written in the disjunctive, it should be interpreted as setting forth alternative bases for indemnification, with "Ameriprise Content" modifying only Ameriprise's right to indemnification for claims arising from "Content."  Opp. at 11-16.  Under this interpretation, the indemnification provision sets forth five bases for indemnification: Ameriprise is entitled to indemnification if the *Zuern* claims arose or resulted from (1) the System; (2) Services; (3) Content (specifically excluding Ameriprise Content); (4) any work product provided by Audatex hereunder; *or* (5) "the use thereof" by Ameriprise.  Opp. at 13.  On Plaintiff's reading, the Ameriprise Content carveout "provides a limitation only where a claim arises *solely* from a problem with Content supplied by

Ameriprise." *Id.* at 15-16 (emphasis added). Audatex, in turn, argues that the terms "system, services, [and] content" are "textually interlinked" and that the carveout therefore modifies all three terms such that the carveout applies if Ameriprise Content is at issue, even where a claim also results from or arises out of Audatex's system or services. Reply at 8-9. Moreover, Audatex argues, because the "use *thereof*" references the preceding terms ("System, Services, Content"), it too is modified by the carveout. Opp. at 9 (emphasis added).

The Court need not wade too deeply into the parties' numerous textual arguments, however, because even accepting Audatex's argument that the carveout modifies the entire clause, which is belied by the disjunctive use of "or" and the placement of the carveout within the clause, the claims in the *Zuern* litigation still do not "result from or arise out" of Ameriprise Content. The parties do not dispute that Section 20.1's "result[] from or aris[e] out of" language necessarily qualifies all the terms that follow, including the carveout parenthetical, such that for the carveout to apply even under a broader reading of 20.1.1, the underlying claims must still "resul[t] from or aris[e] out of" Ameriprise Content. *See, e.g.*, Opp. at 16 (arguing that "the complaint plausibly alleges that the *Zuern* claims arose out of the use of Audatex's system, content, and services, not any Ameriprise Content" (capitalization omitted)); Reply at 4 (arguing that "*Zuern* arose from Ameriprise Content" (capitalization omitted)). Audatex argues that there are at least three bases for finding that Ameriprise Content was "at issue in *Zuern*." Reply at 4; *see* Mot. at 11-12. None are persuasive because Audatex misconstrues the definition of "Ameriprise Content" and otherwise fails to demonstrate a causal link between Ameriprise Content and the *Zuern* claims, which is necessary to trigger the carveout. *See Ameriprise II*, 2024 WL 2350315, at * 2 (holding that "arising out of" requires a causal relationship, although it does not require proximate cause).

First, harkening back to comments from the Second Circuit oral argument, Audatex asserts that Ameriprise "provided content crucial to compliance with [state] law" and that such content "falls under the heading of Ameriprise Content." Mot. at 12 (citing Arg. at 12:45-13:20). The *Zuern* Plaintiffs alleged that Ameriprise "obtain[ed] a market valuation report from a third-party company called AudaExplore,"[9] and that those valuation reports "purport[ed] to contain values for comparable vehicles recently sold or for sale in the geographic area of the insured." *Zuern* Compl. ¶ 19. The *Zuern* Plaintiffs further pleaded that "Ameriprise instruct[ed] AudaExplore as to what specific data to include in the report as the basis for valuation, including whether to include a 'typical negotiation' adjustment to the comparable vehicles." *Id.* Audatex relies on these allegations to argue that "Ameriprise provided vital content at every turn," including instructions and content related to state-law compliance. Mot. at 13. The Court disagrees that this suffices to trigger the carveout.

Even if Ameriprise instructed Audatex to apply the TNA, an instruction does not constitute "Ameriprise Content" within the meaning of the parties' Agreement. "Ameriprise Content" is a defined term in the Agreement that references "content or data created, produced, and developed" by Ameriprise, such as, for instance, Ameriprise trademarks. Agreement sched. 1.0. Any instructions Ameriprise may have relayed to Audatex are not fairly construed as "content or data" produced or developed by Ameriprise. In fact, elsewhere within the Agreement, the parties expressly distinguish between Ameriprise's *instructions* to Audatex on the one hand, and *content* supplied by Ameriprise to Audatex on the other. Section 5.11 provides that Ameriprise will assume "exclusive responsibility" for "(i) the consequences of any instructions Ameriprise gives to [Audatex]," "(ii) Ameriprise's failure to properly Access or use

---

[9] Audatex formerly conducted business as AudaExplore. Mot. at 3.

the Services in accordance with this Agreement," and "(iii) Ameriprise's failure to supply accurate Content."  Agreement § 5.11.  The parties therefore clearly understood "Ameriprise Content" supplied by Ameriprise to implement and operate Audatex's services as separate and distinct from Ameriprise's "instructions" to Audatex as to how to implement those services.[10]

Nor does information supplied by Ameriprise about "its customers and their vehicles" trigger the indemnification carveout for Ameriprise Content.  Mot. at 2*; see also* Tr. at 5:11-20 (Audatex: "In the course of creating [the *Zuern*] valuation(s), there was Ameriprise Content that was supplied . . . Ameriprise, for instance, supplied the geographic location of the car.").  As Audatex itself acknowledges, the "valuation tool was just a tool" provided to Ameriprise and therefore, *every* use of the Autosource system and services necessarily involved *some* claim information supplied by Ameriprise.  Mot. at 15.  Interpreting the carveout as applying if Ameriprise Content was an input in any way in Audatex's System, Services, or Content would have the effect of the carveout exception swallowing the entire indemnification provision.  *See, e.g.*, *RSUI Indem. Co. v. RCG Grp. (USA)*, 539 F. App'x 3, 4 (2d Cir. 2013) (summary order) (rejecting reading of contract that would result in the "exception . . . swallow[ing] the exclusion"); *Lummus Co. v. Commonwealth Oil Ref. Co.*, 297 F.2d 80, 93 (2d Cir. 1961) (rejecting reading of insurance contract that "would allow an exception, ineptly worded to meet a particular problem, to swallow the rule").[11]  Even construing the carveout provision broadly,

---

[10] The umbrella term "Content" is defined as "any and all content and data included within the System, including *market data, security valuations, corporate actions, and any other information related to securities and accounts*."  Agreement sched. 1.0 (emphasis added).  Although "Content" is a defined term distinct from "Ameriprise Content," the examples referenced in the definition of Content are reflective of the types of "content and data" contemplated by the Agreement's definition of Ameriprise Content.

[11] At oral argument, Audatex argued that there are other indemnification provisions available, including Section 20.1.2 (providing indemnification for claims arising out of Audatex's

Audatex still needs to show a causal link between the Ameriprise Content and the *Zuern* claims, that is, that the *Zuern* claims "result[ed] from or aros[e] out of" Ameriprise Content.  Agreement § 20.1.1.  That causal link has not been shown here.  Audatex asserts that *Zuern* "alleged violations of 'Washington law' . . . that were premised on 'the geographic area of the insured' and 'Ameriprise's instructions as to what specific data to include.'"  Mot. at 15 (quoting *Zuern* Compl. ¶¶ 19, 26, 55, 57).  Setting aside that instructions are not Ameriprise Content for the reasons stated above, the *Zuern* allegations were only "premised" on the geographic area of the insureds insofar as the insureds resided in Washington, therefore requiring application of Washington law.  There was no assertion in the underlying *Zuern* litigation, however, that unlawful valuations in any way resulted or arose from information supplied by Ameriprise about the insureds, their locations, or their vehicles.  It is true that the Second Circuit interpreted the "resulting from or arising out of" language expansively, and that proximate cause is not necessary, but "some causal relationship" with the claim is still required.  *Ameriprise II*, 2024 WL 2350315, at *2.  The geographic, insured, or vehicle information supplied by Ameriprise did not cause in any way Audatex's application of the downward TNA adjustment that lies at the core of the *Zuern* allegations.  The *Zuern* complaint was not based on allegations that Ameriprise provided faulty information about its customers, vehicles, or geographic data, or any claims that could be said to result from or arise out of Ameriprise Content, defined as the "content and data created, produced, and developed" by Ameriprise.  Instead, as the Second Circuit summarized it,

---

representations, warranties, and covenants) and Section 20.1.3 (providing indemnification for claims related to intellectual property).  Tr. at 9:15-25.  But the availability of indemnification under other provisions does not impact the Court's analysis with respect to Section 20.1.1.  As to that provision, Audatex's reading results in the exception for Ameriprise Content swallowing the otherwise broad indemnification language covering claims resulting from or arising out of Audatex's System, Services, or Content, or Ameriprise's use thereof.

"Audatex agreed to provide vehicle valuation services, and Ameriprise alleged that its use of those services led to it being sued for violating state law." *Id.* at *3 n.2. Audatex maintains that it is "irrelevant" whether the *Zuern* claims were based on inaccurate or problematic Ameriprise Content because Section 20.1.1 excluded Ameriprise Content without reference to Ameriprise's blameworthiness. Reply at 4. But Audatex misses the point; blameworthiness aside, Audatex's arguments run afoul of the causal link required under Section 20.1.1's "resulting from" or "arising out of" language because the *Zuern* claims do not have a causal relationship with the Ameriprise Content. Audatex's argument boils down to an assertion that the indemnification provision of Section 20.1.1 *never* comes into play, that is, that the carveout is always triggered, when Ameriprise provides any content — names of customers, car information, zip codes — for use in the Autosource System, regardless of whether the claims to be indemnified have any connection to that content. That argument stretches the causal link required for claims "resulting from or arising out of" too far.

Second, Audatex argues that Ameriprise "'request[ed]' changes" to the valuation reports "based on information in Ameriprise's possession" and that this constituted "Ameriprise Content." Mot. at 13, 16. For this proposition, Audatex cites the valuation report appended to Ameriprise's motion to dismiss briefing in *Zuern*. *See id.* at 13 (citing Dkt. 49-2). That report shows that Ameriprise requested revisions to the "Market Area," "Odometer," and "Tax Zip Code" prior to finalizing the report. Dkt. 49-2. First, the valuation reports are not properly before this Court. They are not appended to, incorporated by reference, or relied upon in the Complaint itself. *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("[A] plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere

notice or possession is not enough." (emphasis omitted)).  While the Court can take judicial

notice of the fact of the *Zuern* Litigation and the filings therein, it cannot rely upon documents

filed in that action for the truth of the matter asserted.  *See, e.g.*, *Lurch v. City of New York*, No.

19-cv-11254 (VEC), 2021 WL 1172506, at *1 n.1 (S.D.N.Y. Mar. 29, 2021) ("On a motion to

dismiss, courts may take judicial notice of documents filed in another court 'not for the truth of

the matters asserted in the other litigation, but rather to establish the fact of such litigation and

related filings.'"); *Glob. Networks Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d

Cir. 2006) ("A court may take judicial notice of a document filed in another court . . . to establish

the fact of such litigation and related filings." (citation omitted)).  Nor can the valuation reports

be said to "contradict" Ameriprise's factual assertions in this litigation, such that the Court could

take judicial notice of their substance, as Ameriprise does not dispute that it revised the valuation

reports.  *Cf. Harris v. N.Y. State Dep't of Health*, 202 F. Supp. 2d 143, 173 n.13 (S.D.N.Y. 2002)

("[T]he Court may take judicial notice of admissions in pleadings and other documents in the

public record filed by a party in other judicial proceedings that contradict the party's factual

assertions in a subsequent action.").  More importantly, though, even if the Court did consider

the valuation reports, causation is still lacking: there are no allegations in the *Zuern* litigation that

loss to the insureds resulted or arose from, in any way, Ameriprise's revisions to the

aforementioned fields in the valuation report.

  Third, Audatex argues that the bottom-line valuations Ameriprise offered to its insured

themselves constituted "Ameriprise Content" within the meaning of the carveout.  Mot. at 15.

This argument, too, fails.  The Agreement makes clear that the parties contemplated "Ameriprise

Content" to capture "content and data" "produced and developed" or otherwise owned by

Ameriprise that is necessary to "develop, implement, and operate" Audatex's services, including

the Autosource valuation tool.  Agreement § 5.2; *id.* sched. 1.0.  In fact, under the Agreement,

that was the *only* approved use of Ameriprise Content by Audatex.  *See id.* § 5.2 (licensing

Ameriprise Content to Audatex "solely for the purpose of, and only to the extent necessary for,

[Audatex] to develop, implement, and operate the Services").  The after-the-fact valuations that

Ameriprise provided directly to its customers are not "content and data" of Ameriprise deployed

toward the development, implementation, or operation of Audatex's services.  Moreover, there is

no suggestion in the pleadings or materials incorporated or relied upon therein that, other than

adding taxes and fees, Ameriprise departed from the valuations suggested by Audatex's

Autosource tool.  To the contrary, as Ameriprise acknowledges in its Complaint, the *Zuern*

Plaintiffs pleaded that, "[a]s a general business practice," Ameriprise "offer[ed] its insureds a

claim amount equivalent to the valuation of the loss vehicle that is specified in the market

valuation report prepared by third-party [Audatex]."  *Zuern* Compl. ¶ 20; *see* Compl. ¶ 25.

Audatex maintains that Ameriprise, "as the state-regulated insurer, was free to modify (or

outright disregard) that valuation as it bargained, bartered and negotiated its insureds."  Mot at

16.  That may well be true, but there are no factual allegations before the Court that suggest as

much; rather, accepting the allegations in the Complaint as true, as the Court must at this stage,

Ameriprise ordinarily offered a claim amount "equivalent" to Audatex's valuation.[12]

 Finally, Audatex argues in the alternative that, at a minimum, there is ambiguity as to the

applicability of the "Ameriprise Content" carveout.  Therefore, Audatex argues, Plaintiff has not

---

[12] To the extent that Audatex points to Ameriprise's motion to dismiss briefing in the *Zuern* litigation to suggest that Ameriprise incorporated changes to Audatex's valuations as part of ongoing negotiations with customers, Mot. at 16, for the same reasons as noted above, that material is not properly before this Court.  But even if it were, Ameriprise's *Zuern* briefing states only that Ameriprise added taxes and fees to Audatex's valuation.  *See* Dkt. 49-3 at 8-9.  Such additions are not causally connected in any way to the *Zuern* claims.

shown that it was the parties' "unmistakable intent" to indemnify under the circumstances. Mot. at 17 (quoting *Exonn*, 891 F. Supp. 2d at 562, 566). The Court does not find that the Ameriprise Content carveout is ambiguous here. Given how Ameriprise Content is plainly defined in the Agreement, under either Defendant's or Plaintiff's interpretation of Section 20.1.1's carveout, it is indisputable that the *Zuern* claims did not result from or arise out of "Ameriprise Content" in any way. The Court cannot read into the carveout "obligations the parties never intended to assume" in an effort to harmonize the indemnification clause with the contract's other provisions, as Audatex urges, *id.* at 14, 17. *See, e.g.*, *Haynes*, 921 F.2d at 456 (indemnification provisions "must be strictly construed so as not to read into [them] any obligations the parties never intended to assume"). Regardless of whether Ameriprise was responsible for any instructions given to Audatex, Agreement § 5.11, or for compliance with state laws, *id.* § 26.1, the Second Circuit has already advised that the indemnification provision "trumps" those competing terms. *Ameriprise II*, 2024 WL 2350315, at *3. And since neither instructions nor general state-law compliance constitute Ameriprise Content, under the terms of the Agreement, the indemnification-exception carveout does not apply.

For all of these reasons, this Court finds that Plaintiff plausibly alleges that the Ameriprise Content carveout does not apply here. Therefore, given that the Second Circuit has held that Plaintiff plausibly alleges that the *Zuern* claims resulted from or arose out of the Audatex system for purposes of Section 20.1.1, the Court denies Defendant's motion to dismiss Plaintiff's claim for a breach of Section 20.1.1 of the parties' Agreement.

### C. Ameriprise's Other Contractual Theories

Audatex separately argues that Ameriprise's remaining contractual theories, namely (1) that Audatex owed indemnification under Section 20.1.2 because *Zuern* potentially arose

from a breach of Audatex's contractual representations and warranties and (2) that Audatex breached an obligation to "carry certain insurance," are barred by the mandate and also fail as a matter of law.  Mot. at 20-25.  Ameriprise did not refute (or even address) Audatex's assertion that its alternative contractual theories are not before this Court on remand in its opposition or at oral argument.

The Court agrees with Audatex that the sole issue to survive appeal is whether Section 20.1.1 of the Agreement requires indemnification for the defense of the *Zuern* litigation. Ameriprise focused on Section 20.1.1 before the Second Circuit.  *See* Brief for Plaintiff-Appellant at 1, *Ameriprise II*, No. 23-957 (2d Cir.), ECF No. 49.  The main question presented on appeal was "[w]hether the district court failed to properly interpret the 'notwithstanding' clause of Section 20.1 in determining that Ameriprise was not clearly and unmistakably entitled to indemnification for claims *arising out of the use of Audatex's products and services*."  *Id.* (emphasis added).  The crux of Ameriprise's appeal was therefore premised on Section 20.1.1, not Section 20.1.2, which provides for indemnification for any third-party claims arising out of, among other things, Audatex's representations and warranties as to its compliance with applicable laws and regulations.  In fact, Ameriprise's appellate briefing makes only a passing reference to Section 20.1.2, and the Second Circuit's decision makes no reference to the provision whatsoever.

As for Ameriprise's insurance theory — this Court previously held that the theory was deficient as a matter of law because Ameriprise had pleaded neither breach nor damages. *Ameriprise I*, 675 F. Supp. at 353-54.  Ameriprise did not raise the issue again on appeal. Therefore, because the issue was "ripe for review at the time of the appeal," the Court cannot revisit the "issue on remand unless the mandate can reasonably be understood as permitting it to

do so." *United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001); *see also United States v. Stanley*, 54 F.3d 103, 107 (2d Cir. 1995) (holding that the mandate rule "prohibited district from reopening . . . issue" defendant elected to "forego" on appeal).

"To determine whether an issue remains open for reconsideration on remand, the trial court should look to both the specific dictates of the remand order as well as the broader spirit of the remand." *Ben Zvi*, 242 F.3d at 95 (citation and quotation marks omitted). The Second Circuit's decision interpreted only Section 20.1.1 and, even as to that provision, addressed only the narrow question of whether the *Zuern* claims "resulted from or arose out of" Audatex's Services, System, or Content. The Second Circuit "emphasize[d]" that its holding was limited to finding that this Court "erred in concluding that Ameriprise failed to plead facts sufficient to establish that the *Zuern* claims resulted from or arose out of Ameriprise's use of Audatex's valuation tool," as required to state a claim under Section 20.1.1. *Ameriprise II*, 2024 WL 2350315, at *3. Therefore, the "specific dictates of the remand order as well as the broader spirit of the remand," *Ben Zvi*, 242 F.3d at 95 (citation and quotation marks omitted), indicate that the Second Circuit vacated and remanded for further proceedings only as to Ameriprise's claim for a breach of Section 20.1.1 of the Agreement.

**CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss the Complaint is DENIED.

The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 47.

Dated: January 13, 2025
New York, New York

SO ORDERED.

_Jennifer Rochon_
JENNIFER L. ROCHON
United States District Judge