UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMERIPRISE CAPTIVE INSURANCE
COMPANY, as subrogee of IDS Property
Casualty Insurance Company,

                              Plaintiff,

          -against-

AUDATEX NORTH AMERICA, INC.,

                              Defendant.

Case No. 1:22-cv-05964 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

IDS Property Casualty Insurance Company ("IDS") spent nearly $2.5 million defending

itself against a class action suit in the Western District of Washington (the "*Zuern*" litigation,

after *Zuern v. IDS Property Casualty Insurance Co.*, No. 19-cv-06235 (W.D. Wash.)).  Plaintiff

Ameriprise Captive Insurance Co. ("Ameriprise"), which now purports to stand in IDS's shoes

as its subrogee, says that Defendant Audatex North America, LLC ("Audatex") is contractually

obligated to indemnify IDS (and thus Ameriprise) for those costs.  Audatex, naturally, disagrees.

Following a motion to dismiss, a round trip to and from the Second Circuit, a second motion to

dismiss, and several months of discovery, Ameriprise and Audatex now cross-move for summary

judgment.  For the reasons that follow, the Court GRANTS Audatex's motion and DENIES

Ameriprise's motion.

BACKGROUND

I.    **Procedural History and Factual Background**

Audatex offers "services and systems" for the valuation of vehicles.  Dkt. 129 ("Jt. SUF")

¶ 7.  As the Court reviewed in its initial opinion in this matter, those systems include Audatex's

valuation software tool, "Autosource."  *See Ameriprise Captive Ins. Co. v. Audatex N. Am.*, 675

F. Supp. 3d 340, 343-44 (S.D.N.Y. 2023), *vacated and remanded*, No. 23-957, 2024 WL 2350315 (2d Cir. May 23, 2024) (summary order). Autosource "determine[s] the 'total cash value'" of a given vehicle, then deducts from that value a "typical negotiation adjustment" ("TNA"), which is "the reduction a buyer can normally obtain at a dealership by negotiating down the advertised price of [the] vehicle." *Id.*

IDS was a property and casualty insurance company. Jt. SUF ¶ 5. In October 2011, Audatex and IDS entered into a services contract, *see* Dkt. 110-1 (the "Agreement"), by which Audatex gave IDS access to Autosource, *Ameriprise*, 675 F. Supp. 3d at 343-44. Thereafter, when IDS clients submitted insurance claims for their vehicles, IDS used Autosource to determine (after applying the TNA) what those vehicles were worth. *Id.* at 344. Mackenzie and Eric Zuern, two such clients, submitted a claim to IDS after their car was damaged in an accident. *See* Jt. SUF ¶¶ 30-31. Along with a class of similarly situated plaintiffs, they later sued IDS in Washington, alleging that its use of a TNA in the valuation process "violated its customer's insurance contracts and Washington law." *Ameriprise*, 675 F. Supp. 3d at 345; *see also* Jt. SUF ¶¶ 32-33. The parties settled that action in 2021; as part of the settlement, IDS paid the *Zuern* plaintiffs $1.75 million. Jt. SUF ¶¶ 48-53, 69. IDS later represented that its *Zuern* costs, including that settlement payment, totaled $2.5 million. *Id.* ¶ 79.

Ameriprise initiated this action on July 13, 2022, as IDS's subrogee. *See* Dkt. 1 ("Complaint" or "Compl."); *see also* Subrogee, Black's Law Dictionary (12th ed. 2024) (defining subrogee as "[a] party who by contract or operation of law succeeds to another's right, duty, or claim"). The Complaint asserts a single count for breach of contract under New York

law, alleging that, notwithstanding the Agreement's indemnification clause, Audatex refused to defend and indemnify Ameriprise for costs that IDS incurred in *Zuern*.  Compl. ¶¶ 48-57.[1]

On September 1, 2022, Audatex moved to dismiss the Complaint.  Dkt. 22.  In granting that motion, the Court explained that "an agreement must 'demonstrate an "unmistakable intent" to indemnify the negligent party' for the expenses at issue," *Ameriprise*, 675 F. Supp. 3d at 347 (quoting *Exxon Mobil Corp. v. Tredegar Corp.*, 891 F. Supp. 2d 559, 562 (S.D.N.Y. 2012)), and held that the Agreement, viewed as a whole, failed to so demonstrate, *id.* at 348-53.  The Second Circuit disagreed and remanded the matter to this Court.  *See Ameriprise Captive Ins. Co. v. Audatex N. Am.*, No. 23-957, 2024 WL 2350315 (2d Cir. May 23, 2024) (summary order). Audatex moved to dismiss the Complaint again after remand, focusing on a provision in the Agreement that, it argued, excluded the *Zuern* litigation from the Agreement's indemnification provision.  *See Ameriprise Captive Ins. Co. v. Audatex N. Am., Inc.*, No. 22-cv-05964 (JLR), 2025 WL 81211, at *5 (S.D.N.Y. Jan. 13, 2025).  The Court rejected Audatex's reading of the Agreement, *id.* at *7, and denied the motion, *id.* at *10.  The matter then proceeded through discovery, *see* Dkt. 71, followed by the present summary judgment motions, which were briefed simultaneously.  On September 3, 2025, the parties filed their opening briefs.  *See* Dkt. 105; Dkt. 107 ("Ameriprise Br."); Dkt. 109 ("Pl. SUF"); Dkt. 133 (the "Raiter Declaration"); Dkt. 124; Dkt. 126 ("Audatex Br."); Dkt. 128 ("Def. SUF"); Dkt. 132 (the "Rogers Declaration"); Jt. SUF. On September 24, 2025, the parties filed their opposition briefs.  *See* Dkt. 140 ("Ameriprise Opp."); Dkt. 141 ("Pl. RSUF"); Dkt. 144 ("Audatex Opp."); Dkt. 146 (the "Second Rogers Declaration"); Dkt. 148 ("Def. RSUF").  And on October 8, 2025, the parties filed their replies.

---

[1] The Complaint also included a theory that Audatex breached the Agreement by failing to obtain certain insurance coverage.  *See* Compl. ¶ 54.  That theory is no longer part of this case.  *See Ameriprise Captive Ins. Co. v. Audatex N. Am., Inc.*, No. 22-cv-05964 (JLR), 2025 WL 81211, at *9-10 (S.D.N.Y. Jan. 13, 2025).

3

*See* Dkt. 154 ("Ameriprise Reply"); Dkt. 153 (the "Second Raiter Declaration"); Dkt. 155 ("Audatex Reply").  Both motions are fully briefed.  The parties (and a third party) also submitted letter-motions asking that the Court maintain certain of these filings and related exhibits under seal.  *See* Dkts. 123, 136-38, 142, 150-51, 156.

## II.    Relevant Facts

Although Ameriprise seeks summary judgment based on the language and meaning of the Agreement, *see generally* Ameriprise Br., Audatex focuses on a separate contract — a stock purchase agreement — that has not yet been highlighted in this litigation, *see generally* Audatex Br.  The Court sets forth below the facts necessary to contextualize Audatex's motion.

Ameriprise is a direct subsidiary of Ameriprise Financial, Inc. ("Ameriprise Financial"), and it was created for the express purpose of providing insurance to Ameriprise Financial and its other subsidiaries.  Jt. SUF ¶¶ 2-3.  Until October 1, 2019, IDS was also a subsidiary of Ameriprise Financial.  *Id.* ¶ 6.  On January 1, 2019, Ameriprise issued an insurance policy to Ameriprise Financial (*see* Dkt. 131-4 (the "Ameriprise Policy")), out of which, later, "the costs to defend and resolve the *Zuern* litigation were paid."  *Id.* ¶¶ 18-19.  The Ameriprise Policy provides that, "[o]n payment of loss under [the Ameriprise Policy], the insurers shall be subrogated to the insureds' rights of recovery, contribution and indemnity to the extent of such payment."  *Id.* ¶ 25.

Several months later, Ameriprise Financial "sold, conveyed, assigned, transferred and delivered all of the issued and outstanding shares of capital stock of IDS" to a company called American Family, through a stock purchase agreement (the "SPA") that closed on October 1, 2019 (the "Closing Date").  *Id.* ¶¶ 27-28 (alterations adopted) (internal quotation marks omitted).  Because American Family is "unrelated" to Ameriprise Financial, Pl. RSUF ¶ 2, the SPA severed any "formal relationship" between IDS and Ameriprise, *id.* ¶ 16; *see also* Jt. SUF ¶ 28

4

("IDS was no longer an Ameriprise Financial subsidiary as of October 1, 2019."). Even so, the SPA's terms included that, for six years following the Closing Date, (1) Ameriprise Financial would "renew and otherwise keep in full force and effect any Corporate Insurance Policies that provide claims-made liability insurance coverage and which afforded coverage to [IDS] as of" the Closing Date; and that (2) American Family was permitted to "cause [IDS] to make claims against any corporate Insurance Policies, in each case, solely with respect to acts, errors, omissions, events or circumstances relating to [IDS] that occurred, took place or existed prior to the Closing [Date]." Jt. SUF ¶ 29 (quoting Dkt. 132-6 ("SPA") at 4059)).[2] The parties agree the Ameriprise Policy was a claims-made policy that afforded coverage to IDS as of the Closing Date. Def. RSUF ¶ 21.

Zuern was filed on October 25, 2019, nearly one month after the Closing Date. Jt. SUF ¶ 32. The complaint in that case alleged "ongoing" unlawful practices by IDS and sought to certify a class of plaintiffs who, "through the date of resolution of [Zuern], received compensation for the total loss of their vehicles." Pl. RSUF ¶¶ 20, 22; see also Jt. SUF ¶ 55 (quoting from the Zuern settlement agreement, which defined the "settlement class" as IDS insureds who "received compensation for the total loss of their vehicles . . . and received a total loss valuation from IDS based upon an Audatex valuation" "from the earliest allowable time through the date of resolution of this action"); id. ¶¶ 48-49 (jointly stating that Zuern "included claims by IDS insureds from October 2013 through the preliminary approval date" of the parties' settlement agreement on February 25, 2021 (internal quotation marks omitted)).

---

[2] The SPA does not refer directly to IDS, but rather to "the Acquired Companies," because Ameriprise Financial sold two additional entities in the transaction. See Jt. SUF ¶ 27.

**LEGAL STANDARD**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is the moving party's burden to demonstrate the absence of any genuine factual dispute, and the Court "constru[es] the evidence in the light most favorable to the nonmoving party . . .[,] drawing all reasonable inferences and resolving all ambiguities in its favor." *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018) (alterations adopted) (quoting *Darnell v. Pineiro*, 849 F.3d 17, 22 (2d Cir. 2017)). "'When both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party.' Rather, the court evaluates each party's motion 'on its own merits,' and 'all reasonable inferences' are drawn 'against the party whose motion is under consideration.'" *Roberts v. Genting New York LLC*, 68 F.4th 81, 88 (2d Cir. 2023) (alteration adopted) (citation omitted) (quoting *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).

**AUDATEX'S MOTION**

The Court begins with Audatex's motion for summary judgment, because it concerns Ameriprise's subrogation rights and, therefore, sits at the threshold of the parties' dispute over the meaning of the Agreement's indemnification clause.

I.   **Discussion**

Audatex seeks summary judgment based on three premises: (1) the SPA extinguished Ameriprise's obligation to pay IDS for *Zuern*, and therefore Ameriprise has no enforceable subrogation right here, *see* Audatex Br. at 16-19; (2) an anti-assignment clause in the Agreement further bars Ameriprise from asserting IDS's rights post-SPA, *id.* at 19-20; and (3) even if Ameriprise can assert rights as a subrogee, it would be bound by the Ameriprise Policy, which

limits its damages to the amount IDS actually paid, *id.* at 20-22.  The Court agrees with

Audatex's first argument and therefore does not reach the second or third.

A.       **The SPA Extinguished Ameriprise's Obligation to Pay for *Zuern***

Audatex first argues that, because of the SPA, IDS had the right to make claims under the

Ameriprise Policy "solely with respect to acts, errors, omissions, events or circumstances that

occurred, took place or existed prior to" the Closing Date, Br. at 16 (alteration adopted) (quoting

Jt. SUF ¶ 29), and that the claims in *Zuern* do not so qualify because they include those that

occurred after the Closing Date, *id.* at 17-19.  Audatex thus concludes that Ameriprise has no

subrogation right to any indemnification claim that IDS could bring against Audatex for the costs

of *Zuern*.  The Court agrees.

"Subrogation is the principle by which an insurer, having paid losses of its insured, is

placed in the position of its insured so that it may recover from the third party legally responsible

for the loss."  *Winkelmann v. Excelsior Ins. Co.*, 650 N.E.2d 841, 843 (N.Y. 1995).  "It is

axiomatic," however, "that in order to 'stand in someone's shoes' a party must establish his right

to be there."  *Met Frozen Food Corp. v. Nat'l Bank of N.A.*, 393 N.Y.S.2d 643, 648 (N.Y. Sup.

Ct. 1977).  In New York, that right "may arise either contractually or under the doctrine of

equitable subrogation."  *Millenium Holdings LLC v. Glidden Co.*, 53 N.E.3d 723, 728 (N.Y.

2016).

In contractual subrogation, "the subrogee's rights are defined in an express agreement

between the insurer-subrogee and the insured-subrogor."  *N.Y. Mun. Ins. Reciprocal v. Stewart's

Shops Corp.*, 212 N.Y.S.3d 859, 860 (N.Y. App. Div. 2024) (quoting *Fed. Ins. Co. v. Arthur

Andersen & Co.*, 552 N.E.2d 870, 872 (N.Y. 1990)); *accord Quiller, Inc. v. United States*, No.

20-cv-02513 (AT), 2022 WL 4225542, at *3 (S.D.N.Y. Sept. 3, 2022).  Subrogation provisions

are not uncommon in insurance policies, and they control the parties' rights when they exist;

7

"[s]till, when giving meaning to contractual subrogation provisions, courts appropriately rely on equitable subrogation principles on the assumption that, absent an evident intention to the contrary, the parties meant to incorporate those principles." *World Trade Ctr. Props. LLC v. QBE Int'l Ins. Ltd.*, 627 F. App'x 10, 13 (2d Cir. 2015) (summary order); *accord Quiller*, 2022 WL 4225542, at *3.

To establish an equitable right to subrogation, "the purported subrogee must initially prove two elements. First, [the subrogee] must have actually paid the subrogor for the subrogor's loss . . . . Second, [the subrogee] must prove that the work it undertook was done pursuant to some obligation running from the subrogee to the subrogor." *Liberty Mut. Ins. Co. v. N. Picco & Sons Contracting Co.*, No. 05-cv-00217 (SCR), 2008 WL 190310, at *7 (S.D.N.Y. Jan. 16, 2008) (citation omitted); *accord Wellsville Manor LLC v. Great Am. Ins. Co.*, No. 22-cv-01229 (MKB), 2025 WL 2173642, at *7 (E.D.N.Y. July 31, 2025); *see also Fed. Ins. Co.*, 552 N.E.2d at 872 (explaining that equitable subrogation rights "are based upon the principle that in equity an insurer, which has been *compelled* under its policy to pay a loss, ought in fairness to be reimbursed by the party which caused the loss" (emphasis added)). In other words, the second requirement of subrogation is not met where an insurer volunteers payment to cover its insured's loss. *See, e.g.*, *Millenium Holdings LLC v. Glidden Co.*, 46 N.Y.S.3d 528, 535 (N.Y. App. Div. 2017) (explaining that, under the "voluntary payment doctrine," "a right of subrogation exists only for payments an insurer is contractually obligated to pay," and therefore an insurer that pays its insureds costs as "a mere volunteer" is not entitled to subrogation); *Nat'l Union Fire Ins. Co. v. Ranger Ins. Co.*, 599 N.Y.S.2d 347, 348 (N.Y. App. Div. 1993) (collecting cases; explaining that "[i]t is well settled that 'a mere volunteer or intermeddler will not be substituted in the place of a person whose rights he seeks to acquire, simply because he has paid a debt, or discharged an obligation, for which that person was responsible'"; and concluding that "[b]ecause [plaintiff]

was not obligated under its policy of insurance, it became a volunteer with no right to recover the monies it paid on behalf of its insured" (alteration adopted) (quoting *Koehler v. Hughes*, 42 N.E. 1051, 1052-53 (N.Y. 1896))).

Here, the Ameriprise Policy contains a subrogation clause providing that, "[o]n payment of loss under this policy, the insurers shall be subrogated to the insureds' rights of recovery, contribution and indemnity to the extent of such payment." Ameriprise Policy at 1621. And, as discussed, the SPA required that Ameriprise Financial "renew and otherwise keep in full force and effect any Corporate Insurance Policies that provide claims-made liability insurance coverage and which afforded coverage to [IDS] as of the date hereof . . . with materially the same terms and conditions" for six years after the Closing Date. SPA at 4059. That provision applied to the Ameriprise Policy. Def. RSUF ¶ 21. In other words, the Ameriprise Policy, kept in effect by the SPA for six years after the Closing Date of October 1, 2019, could be a source of Ameriprise's right to contractual subrogation by its own terms, as Ameriprise has pleaded and argued elsewhere (but does not press in its opposition brief). *See* Compl. ¶ 47 (alleging that Ameriprise "is subrogated to the rights of IDS" "[t]hrough a policy of insurance issued by [Ameriprise]"); *see also* Pl. RSUF ¶ 85 (asserting that "[Ameriprise] is entitled to both equitable and contractual subrogation"). However, "[n]othing in the text of" the Ameriprise Policy "suggests that the parties intended to contract around equitable subrogation principles." *In re September 11 Litig.*, 328 F. Supp. 3d 178, 187 (S.D.N.Y. 2018); *see id.* at 186-87 (applying equitable subrogation concept of the "made whole rule" where contract did not explicitly "avoid [its] limited application"). To the contrary, the Ameriprise Policy ties the right of subrogation to a "payment of loss under this policy," Ameriprise Policy at 1621 — that is, the contract entitles Ameriprise to subrogation after it makes a payment the Ameriprise Policy requires it to make, *see Pape v. Home Ins. Co.*, 139 F.2d 231, 234 (2d Cir. 1943) ("An insurance policy is

9

fundamentally an agreement to pay a sum on the happening of an event; when that event has definitely taken place in accordance with the terms of the contract, the payment becomes due."), which is a principle of equitable subrogation, *see Millenium Holdings LLC*, 46 N.Y.S.3d at 535 (explaining that equitable subrogation arises only where "insurer is contractually obligated to pay"). Therefore, regardless of the Ameriprise Policy's subrogation provision, subrogation here turns on a fundamentally equitable principle: whether Ameriprise was obligated to pay for *Zuern*.

There is no dispute here that Ameriprise *did* pay IDS for losses that IDS incurred in defending *Zuern*. Pl. RSUF ¶ 80. That fact satisfies the first element of equitable subrogation. *Liberty Mut. Ins. Co.*, 2008 WL 190310, at *7 ("First, [the subrogee] must have actually paid the subrogor for the subrogor's loss[.]"). But the Court finds that Ameriprise cannot satisfy the second element — that it paid the loss out of obligation.

As relevant here, and consistent with a claims-made policy generally, the Ameriprise Policy's terms and conditions include that "cover[age] under this policy is afforded solely with respect to . . . loss arising from any claim(s) first made against an insured during the policy period," "loss arising from any claim(s) which could have been made during the policy period," or "loss in accordance with" certain other aspects of the Ameriprise Policy "first arising, paid or incurred during the policy period." Ameriprise Policy at 1618. A "claim" is defined as "a written demand, notice or complaint, suit or counter claim or any similar document . . . seeking compensation or other legal relief." *Id.* at 1625. Moreover, "all claims arising out of, based upon or attributable to the same originating cause or source (or related or causally connected or continuous originating causes or sources)" are treated as a "[s]ingle claim," even if those claims do not all "arise out of the same or essentially the same or a number of facts or a number of wrongful acts," and even if those claims do not all "involve the same . . . claimants, insureds or legal causes of action." *Id.* at 1631. Similarly, the Ameriprise Policy provides for "related

10

claims": If IDS properly gives notice of one claim, and later gives notice of a subsequent claim that "constitutes a single claim with" the first claim, then the subsequent claim "may, at the sole discretion of [Ameriprise Financial], be deemed to have been first made at the same time as" the first claim. *Id.* at 1620.

Notwithstanding these provisions and the claims-made policy they created, and notwithstanding the SPA's requirement that Ameriprise Financial keep that policy in place for six years after the Closing Date, the SPA expressly restricts the post-closing availability of the Ameriprise Policy by permitting IDS "to make claims against" it, "in each case, solely with respect to acts, errors, omissions, events or circumstances relating to [IDS] that occurred, took place, or existed prior to the Closing [Date]." SPA at 4060. Seizing on this restriction, Audatex argues that *Zuern* includes allegations of IDS's wrongdoing both before and after the Closing Date — not just "solely" prior to the Closing Date — and that this "eliminates Ameriprise['s] alleged duty to pay" for it according to the SPA's plain language. Audatex Br. at 17. In response, Ameriprise contends that *Zuern* allegations concerning post–Closing Date conduct are irrelevant: The entirety of *Zuern* constitutes "a single claim" within the meaning of the Ameriprise Policy, says Ameriprise, so "any 'subsequent claims' encompassed by *Zuern* were 'first made at the same time' as the Zuerns' claim." Ameriprise Opp. at 16-17 (quoting Ameriprise Policy at 1620). The Court agrees with Audatex.

The Court begins with the SPA, which, notably, contains a choice of law provision stating that it "shall be governed by and construed in accordance with the Laws of the State of Delaware, without respect to its applicable principles of conflicts of laws that might require the application of the laws of another jurisdiction." SPA at 4075. Ameriprise argues that Minnesota law applies to the *Ameriprise Policy*, Ameriprise Opp. at 14, but neither party mentions the SPA's choice of law provision, and the parties' briefing does not clearly evince an assumption as

11

to which state's law should apply. *See Henneberry v. Sumitomo Corp.*, 532 F. Supp. 2d 523, 532 n.4 (S.D.N.Y. 2007) ("[A] a court is not required to conduct a choice of law analysis *sua sponte*, and instead may apply the state law assumed by the parties in their papers."). This Court enforces choice-of-law provisions "so long as the State selected has sufficient contacts with the transaction" and there is no "fraud or violation of public policy." *United States v. Mosley*, 980 F.3d 9, 20 (2d Cir. 2020) (quoting *Int'l Mins. & Res., S.A. v. Pappas*, 96 F.3d 586, 592 (2d Cir. 1996)); *accord Stevens & Co. LLC v. Espat*, No. 24-cv-05223 (LJL), 2025 WL 950989, at *5-8 (S.D.N.Y. Mar. 28, 2025). One of the parties to the SPA is Ameriprise Financial, a Delaware corporation, SPA at 4002, so Delaware has sufficient contacts with the SPA, *see Shetiway v. Midland Credit Mgmt.*, 959 F. Supp. 2d 469, 473 n.33 (S.D.N.Y. 2013) ("New York regularly enforces similar choice-of-law provisions where one of the parties is located in the chosen state."); *accord Cyber Apps World, Inc. v. EMA Fin., LLC*, 645 F. Supp. 3d 281, 286 (S.D.N.Y. 2022). Nor is there any suggestion of fraud or violation of public policy here. Therefore, the Court will enforce the SPA's choice-of-law provision and apply Delaware law to construe its meaning.

Delaware courts "'place great weight on the plain terms of a disputed contractual provision,' and, therefore, . . . 'interpret clear and unambiguous terms according to their ordinary meaning.'" *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 338 (Del. 2022) (quoting *Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 760 (Del. 2022)). In addition, courts must remain cognizant of the fact that "words appear in phrases, in sentences, in paragraphs, and in entire provisions," and thus the plain meaning of a given "term or phrase" often depends on how it "is used in a particular legal context." *In re P3 Health Grp. Holdings, LLC*, 282 A.3d 1054, 1066-67 (Del. Ch. 2022). The Court therefore conducts a textual analysis of the SPA provision at issue, applying, in particular, three concepts to that provision.

First, the word *solely* — which is functionally the equivalent of *only*, *see* Only, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/only (last visited July 19, 2026) (defining "only" as "solely, exclusively") — typically modifies "the word or phrase that immediately follows it," Chicago Manual of Style ¶ 5.186 (17th ed. 2017) (discussing the "[u]se and misuse of 'only'").

Second, a "restrictive element" in a sentence is "[a] phrase or clause that limits the essential meaning of the sentence element it modifies or identifies."  William Strunk Jr. & E.B. White, The Elements of Style 94 (4th ed. 2000).  And "[t]he word 'that' is used to introduce an essential, or restrictive, clause.  In other words, 'that' is used to introduce a clause that is 'essential to the meaning of the noun it belongs to.'"  *Hanna Enters., Inc. v. Travelers Indem. Co.*, No. 07C-09-001, 2008 WL 3322097, at *2 (Del. Super. Ct. June 20, 2008) (citation omitted) (quoting Chicago Manual of Style ¶ 6.31 (15th ed. 2003)).

Third, Delaware courts apply the rule of the last antecedent in contract interpretation. *Hawkins v. Daniel*, 273 A.3d 792, 825 (Del. Ch. 2022) (referring to "the rule of the last antecedent" as "a settled principle of interpretation," and applying it to interpretation of proxy agreement).  Under that rule, "qualifying words or phrases modify the words or phrases immediately preceding them and not words or phrases more remote," such that, "in the phrase *Texas courts, New Mexico courts, and New York courts in the federal system*, the words *in the federal system* might be held to modify only *New York courts* and not *Texas courts* or *New Mexico courts*."  Rule of the Last Antecedent, Black's Law Dictionary (12th ed. 2024); *see also Hawkins*, 273 A.3d at 824-26 (interpreting "their" — in provision providing that contract is "binding upon . . . Stockholder and the Holders and *their* respective heirs" — as modifying only "Holders" as opposed to both "Holders" and "Stockholder" (emphasis added)).  However, courts may override this rule where "the extension [to more remote words] is necessary from the

context or the spirit of the entire writing." Rule of the Last Antecedent, Black's Law Dictionary (12th ed. 2024); *see One Cypress Terminals, LLC v. Bluewing Midstream, LLC*, No. 2022-0694, 2023 WL 2401693, at *7 (Del. Ch. Mar. 8, 2023).

The SPA provides that IDS may "make claims against [the Ameriprise Policy], in each case, solely with respect to acts, errors, omissions, events or circumstances relating to [IDS] that occurred, took place or existed prior to the Closing [Date]." SPA at 4059. "The word 'solely' plainly means 'to the exclusion of all else' or 'without another.'" *LG Elecs. Inc. v. Invention Investment Fund*, --- A.3d ---, 2026 WL 935618, at *7 (Del. Apr. 7, 2026) (quoting Solely, Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/solely). The phrase immediately following *solely* in the SPA is "with respect to," which "means 'referring to,' 'concerning,' or 'relating to,'" *Jennings v. Rodriguez*, 583 U.S. 281, 320 (2018) (Thomas, J. concurring) (alteration adopted) (citation omitted), or even "about," *see Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 716-17 (2018). This is a prepositional phrase connecting *solely* to the noun phrase that follows: "acts, errors, omissions, events or circumstances." SPA at 4059. So far, then, the SPA permits claims solely about acts, errors, omissions, events or circumstances.

Next, "relating to [IDS]," a qualifying phrase, modifies that same noun phrase, "acts, errors, omissions, events or circumstances," rather than only circumstances. *Id.* This is because a rigid application of the last antecedent rule here would render the SPA nonsensical: It would permit claims with respect to *circumstances* relating to IDS, but not claims with respect to *events* relating to IDS. Such an interpretation would be unreasonable. *See Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1044 (Del. 2023) ("An interpretation is unreasonable if it 'produces an absurd result' or a result 'that no reasonable person would have accepted when entering the contract.'" (quoting *Manti Holdings, LLC v. Authentix Acquisition Co.*, 261 A.3d 1199, 1208 (Del. 2021))).

14

Finally, and crucially, the word *that* introduces the sentence's restrictive clause: "occurred, took place or existed prior to the Closing [Date]." SPA at 4059. And in this instance, the "noun [that this restrictive clause] belongs to," *Hanna*, 2008 WL 3322097, at *2, is again the preceding noun phrase, as modified by the qualifying phrase: "acts, errors, omissions, events or circumstances relating to [IDS]," SPA at 4059.

In sum, and in plainer English, the SPA permitted IDS's claims against the Ameriprise Policy, but those claims must be *solely* about acts, errors, omissions, events or circumstances relating to IDS that occurred before the Closing Date. *Zuern* is not such a claim. Although the Zuerns themselves alleged that they had received an illegal total loss valuation from IDS in 2017, *see* Dkt. 1-1 ¶ 22, the *Zuern* complaint sought to certify a class of plaintiffs who had received similar valuations "through the date of resolution of this action," *id.* ¶ 26, and it alleged that IDS's "unlawful common policy and general business practice as described herein are ongoing," such that IDS "has violated, and continues to violate, Washington law," *id.* ¶ 56; *see also* Pl. RSUF ¶¶ 20, 22. The December 11, 2020 settlement agreement defined the settlement class as IDS insureds who "received compensation for the total loss of their vehicles . . . and received a total loss valuation from IDS based upon an Audatex valuation" "from the earliest allowable time through the date of resolution of this action." Jt. SUF ¶ 55. The *Zuern* court preliminarily approved of that settlement agreement on February 25, 2021, *id.* ¶ 48, meaning that the date of resolution of *Zuern* was, at the earliest, February 25, 2021, *see id.* ¶ 49 ("The *Zuern* matter included claims by IDS insureds from October 2013 through the preliminary approval date." (citation modified)); *see also id.* ¶ 51 ("The Court in *Zuern* approved the final settlement on May 26, 2021."). In other words, *Zuern* includes plaintiffs who alleged that they had received illegal valuations from IDS beginning in October 2013 and ending in February 2021 — well beyond the SPA's Closing Date on October 1, 2019. Thus, a claim that is partially based on IDS's acts that

15

occurred after the Closing Date is not a claim that is "solely" with respect to acts that occurred prior to the Closing Date, as required by the SPA.

To be sure, *Zuern* includes such pre-occurring acts. But recall the importance of *solely*'s placement in the sentence. If the SPA permitted "*solely* claims" with respect to acts relating to IDS that occurred before the Closing Date, then *Zuern* would seem to qualify. That is not what the SPA says, however: The SPA says that it permits "claims *solely*" with respect to acts relating to IDS that occurred before the Closing Date. *See Premcor Refining Grp., Inc. v. Matrix Serv. Indus. Contractors, Inc.*, No. 07C-01-095, 2008 WL 2232641, at *8-9 (Del. Super. Ct. May 7, 2008) (reading policy provision "denying coverage 'to any liability which arises *solely* from the acts or omissions of such organization'" as meaning that "an additional insured is not covered for punitive damages where the liability arises from omissions which are its alone," and holding that plaintiff was not entitled to coverage where its purported joint tortfeasor could not be held liable under Delaware law (omission adopted) (citation omitted)); *In re GGP, Inc. Stockholder Litig.*, 282 A.3d 37, 65-66 (Del. 2022) (holding that, where corporation issued "massive" dividend just before merger's closing, and proxy agreement advised stockholders they were entitled to appraisal "solely in connection with the merger," stockholders "tak[ing] [the agreement] at its word" would "conceivabl[y], if not . . . certain[ly] . . . conclude[]" that any appraisal would not reflect pre-closing dividend's value).

Ameriprise ignores most of Audatex's textual argument in resisting this reading of the SPA, instead emphasizing that the Ameriprise Policy is claims-based. Ameriprise Opp. at 14-17. True, the Ameriprise Policy is a claims-made policy — but the SPA limited its coverage to claims that solely concerned acts occurring before the SPA's Closing Date. SPA at 4060; *see* Dkt. 132-2 at 32:23-33:1 (Ameriprise corporate representative agreeing that, under the SPA, "there can only be claims about things to the extent they existed before October 1, 2019"). Thus,

16

while the Ameriprise Policy is claims-made by its terms, the SPA's unambiguous occurrence-based limitation transformed it, in effect, to a hybrid policy. *See, e.g.*, *Am. Int'l Specialty Lines Ins. Co. v. Nat'l Ass'n of Bus. Owners & Pros.*, 324 F. Supp. 2d 353, 358 (E.D.N.Y. 2004) (explaining that "[t]here are several types of 'claims-made' policies," and that one of them, "also known as a hybrid claims-made policy, 'is one that requires not only that the claim . . . be made and reported to the insurer during the policy period, but also that the claim arise out of wrongful acts that take place after the inception of the policy and during the policy period'" (quoting Ostrager & Newman, Handbook on Insurance Coverage Disputes § 4.02[b][4] (12th ed. 2004))); *see also City of Mankato v. League of Minn. Cities Ins. Tr.*, No. C8-93-1090, 1993 WL 527886, at *3 (Minn. Ct. App. Dec. 21, 1993) (explaining that "claims-made policies sometimes contain retroactive exclusion clauses, making such a policy a hybrid of sorts . . . [with] 'the effect of excluding from coverage acts, errors or omissions which were committed by the insured prior to the policy period even though a claim is made against the insured during the policy period'" (citation omitted)). Given this modification, it is immaterial that individual plaintiffs in the *Zuern* class may have sustained injuries across time that, together, constitute a "single claim" or "related claim" under the Ameriprise Policy, Ameriprise Opp. at 16-17, because the timing of the claim *submission* is not at issue here — what matters are the occurrences underlying the claim. As explained above, those occurrences must have occurred solely — that is, wholly — before the Closing Date, and the occurrences in *Zuern* did not.

An instructive case is *Kapoor v. Fujisawa Pharmaceutical Co.*, No. 93C-06-50, 1994 WL 233947 (Del. Super. Ct. May 10, 1994) (unpublished table decision), *aff'd*, 655 A.2d 307 (Del. 1995). There, the defendant corporation acquired another company and then sued that company's former director. *Id.* at *1. The former director, in turn, sued the defendant, seeking indemnification in the underlying litigation; in particular, he sought an advancement of his

defense costs. *Id.* His entitlement to that advancement turned on the meaning of the merger agreement that the defendant had executed with the target company. *Id.* at \*2. The agreement provided, in relevant part, that "all rights to indemnification . . . now existing in favor of the directors . . . as of the date hereof with respect to matters occurring prior to the Effective Time shall survive the Merger and shall continue in full force and effect." *Id.* at \*2. The defendant argued that this meant "the claim against the director must have arisen, or been contemplated, before the merger was consummated," but the court disagreed: "[T]he phrase 'occurring on or prior to the Effective Time' modifies the language relating to *when* the indemnified parties' *conduct* which forms the basis for the claim must *occur*, *not* the time when the lawsuit must be brought." *Id.* at \*5. In other words, as here, the merger agreement there imposed an occurrence-based restriction on the indemnification policy. If the merger agreement had, instead, applied only "to claims that occurred, or at least were contemplated or threatened, prior to the Effective Time, then [it] would have so stated." *Id.* (internal quotation marks omitted). The same is true of the SPA.

As for any argument that Ameriprise could be IDS's subrogee with respect to the pre–Closing Date acts underlying the claim in *Zuern*, even if it cannot be its subrogee with respect to any of the post–Closing Date acts, Ameriprise did not plead its right to subrogation on that basis, has not advanced such a partial-subrogation theory in the context of the present motion, and does not appear to have sought reimbursement for *Zuern* on that basis. *See* Dkt. 132-2 at 169:5-9 (deposition of Ameriprise corporate representative: "Q. And the $1.75 million [settlement] payment was paid to resolve claims between January 2, 2020 through the preliminary approval date, right? A. It was paid to settle the Zuern matter. Q. And the Zuern matter included claims by IDS insureds between January 2, 2020 and the preliminary approval date, right? A. It would. October 25, 2013[,] through the preliminary approval date."); *see also id.* at 193:19-194:9

18

(testifying that IDS spent nearly $2.5 million "for defense and settlement and mediation fees and so on" in *Zuern*, and that Ameriprise reimbursed "[e]verything in excess of [a retainer amount]").

Ameriprise further ignores the SPA in arguing that it paid IDS for *Zuern* because it determined the suit to be an obligation under the Ameriprise Policy. *See* Ameriprise Opp. at 19-20. Ameriprise cites to no authority supporting the proposition that its subjective view of its obligation is sufficient to establish the second requirement of equitable subrogation. Even if that subjective view were sufficient, the evidence Ameriprise points to in establishing it is a November 2019 letter written by Sedgwick, the entity that "handl[ed] th[e] matter on [Ameriprise]'s behalf." Dkt. 133-51 at 2258, 2261. That letter is devoid of analysis concerning what effect, if any, the SPA had on the Ameriprise Policy's applicability to the *Zuern* litigation — in fact, the letter contains no mention of the SPA at all in reaching its conclusion that "coverage [was] available to IDS for [*Zuern*]." *Id.* at 2261. And while there is evidence elsewhere in the record that *Ameriprise* was "aware of the [SPA]," Dkt. 132-2 at 33:22-25, Ameriprise points to no evidence, and there is no indication in the November 2019 letter, that Ameriprise told Sedgwick about it, or that Sedgwick was independently aware.

Therefore, the SPA extinguished Ameriprise's obligation to pay IDS for *Zuern*. As a result, Ameriprise cannot establish its right to equitable or contractual subrogation, and it cannot step into IDS's shoes to seek indemnification from Audatex for *Zuern* here. *See Millenium Holdings LLC*, 46 N.Y.S.3d at 535 ("[A] right of subrogation exists only for payments an insurer is contractually obligated to pay[.]"). Given this determination, the Court need not reach Audatex's additional, independent arguments supporting its entitlement to summary judgment. Moreover, the Court cannot reach Ameriprise's motion for summary judgment, which is premised entirely on Ameriprise's right to indemnification under the Agreement — a right it

would have only as IDS's subrogee. Therefore, the Court grants summary judgment to Audatex and denies Ameriprise's cross-motion as moot.

## THE SEALING MOTIONS

Having resolved the parties' summary judgment motions, the Court addresses the sealing motions that the parties (and American Family, the unrelated third party that purchased IDS) have filed in connection with these cross-motions for summary judgment.

## I.    Legal Standard

"Judicial documents are subject at common law to a potent and fundamental presumptive right of public access[.]" *Olson v. Major League Baseball*, 29 F.4th 59, 87 (2d Cir. 2022) (quoting *Mirlis v. Greer*, 952 F.3d 51, 58 (2d Cir. 2020)). The Second Circuit has articulated a three-step test for district courts to follow in deciding whether a filing can remain under seal. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). First, the Court must "conclude that the documents at issue are indeed 'judicial documents,'" meaning that the item is "relevant to the performance of the judicial function and useful in the judicial process." *Id.* (quoting *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995)). Second, the Court "determine[s] the weight of that presumption," which is "governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *Id.* (quoting *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995)). Lastly, the Court is directed to weigh the presumption of public access attached to the document against the countervailing factors. *Id.* at 120.

"[D]ocuments submitted to a court for its consideration in a summary judgment motion are — as a matter of law — judicial documents to which a strong presumption of access attaches," and such documents "should not remain under seal absent the most compelling reasons." *Lugosch*, 435 F.3d at 121 (quoting *Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982)).

20

Therefore, the first two *Lugosch* factors weigh against the motions to seal, and the Court focuses here on whether the parties have demonstrated countervailing factors sufficient to overcome these factors.  In keeping with the presumption of access, "the burden of justifying sealing rests with the party seeking sealing."  *Emigrant Bank v. SunTrust Bank*, No. 20-cv-02391 (PGG) (OTW), 2025 WL 3140423, at *2 (S.D.N.Y. Nov. 10, 2025).

I.    **Documents Filed Under Seal by Ameriprise**

Ameriprise first seeks to seal certain documents containing privileged communications between, or legal analysis conducted by, third party American Family's in-house and/or outside counsel.  *See* Dkt. 104 (identifying Exhibits 6, 8, 11, 50, 52, and 53 of the Raiter Declaration); *see also* Dkts. 111, 113, 115, 119, 121 (sealed versions of those same exhibits).  American Family's position is in accord.  *See* Dkt. 136 (American Family letter arguing to maintain these documents under seal); *see also* Dkts. 151 & 156 (both seeking sealing of Exhibit 2 of the Second Raiter Declaration (four-page excerpt of deposition transcript) for same reason).  The Court has reviewed these documents and agrees that they contain privileged material concerning American Family's counsel's analysis of, or strategies concerning, the *Zuern* litigation. Therefore, these documents shall remain under seal, and Ameriprise's publicly filed versions of these exhibits at Dkt. 133 are appropriately redacted.  *See, e.g.*, *Flatiron Acquisition Vehicle, LLC v. CSE Mortg. LLC*, No. 17-cv-08987 (GHW), 2021 WL 4481853, at *2 (S.D.N.Y. Sept. 29, 2021) (collecting cases and noting that "[n]umerous courts in this District have found privilege to be a compelling reason to overcome the presumption of access"); *In re SunEdison, Inc. Securities Litig.*, No. 16-cv-07917 (PKC), 2019 WL 126069, at *1 (S.D.N.Y. Jan. 7, 2019) ("The privacy interests of 'innocent third parties . . . should weigh heavily' when balancing the presumption of disclosure." (quoting *Amodeo*, 71 F.3d at 1050)).  However, while Ameriprise has referred to a redacted version of Exhibit 53 of the Raiter Declaration (currently filed under

21

seal at Dkt. 121), *see* Dkt. 104 at 2, no such version has been filed with the other public exhibits at Dkt. 133.  Ameriprise must promptly file the redacted version of this exhibit.

Ameriprise next seeks the sealing of certain documents because they contain sensitive financial and other business information, including bank statements, *see* Dkt. 104 (identifying Exhibits 7, 9, 14, 16, and 59 of the Raiter Declaration); *see also* Dkts. 112, 114, 116, 117, 122 (sealed versions of those same exhibits), and the sealing of another document because it contains privileged communications by counsel in the *Zuern* litigation, *see* Dkt. 104 (identifying Exhibit 42 of the Raiter Declaration); *see also* Dkt. 118 (sealed version of the same exhibit).  The Court agrees that most of these documents merit sealing, particularly Exhibits 7, 14, 16, and 59, which are bank statements and other financial records.  *See Pizzaro v. Sazerac Co.*, No. 23-cv-02751 (KMK), 2026 WL 296593, at *5 (S.D.N.Y. Feb. 3, 2026) (collecting cases, and explaining that "detailed financial information concerning a privately held business, not previously disclosed to the public, will in most cases warrant confidential treatment" (citation omitted)).  Those documents shall remain under seal.  The Court also agrees that Dkt. 118 contains privileged material and shall remain under seal for that reason.

But the Court will not seal the Ameriprise Policy, *see* Dkt. 114, which Ameriprise characterizes conclusorily as "a confidential and sensitive business document that Ameriprise entities do not circulate publicly."  Dkt. 104 at 2.  Despite that characterization, which Ameriprise does not otherwise explain, Ameriprise quotes extensively from the Ameriprise Policy, without redactions, in opposition to Audatex's motion.  *See, e.g.*, Ameriprise Opp. at 3-5, 15-16.  Indeed, in a subsequent letter addressing documents that Audatex filed under seal with its summary judgment papers, Ameriprise concedes that it "does not object to the [Ameriprise] Policy['s] language being quoted or paraphrased in the parties' briefing and does not believe that redaction of such language is required in briefs."  Dkt. 138 at 1.  Ameriprise has not filed a

22

redacted version of the Ameriprise Policy to remove the portions it believes to be confidential and sensitive; indeed, Ameriprise has provided this Court with "virtually no additional information that would permit [the Court] to make the specific findings necessary to justify sealing" of the Ameriprise Policy in full or even in limited form.  *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14-md-02542 (VSB), 2023 WL 196134, at *9 (S.D.N.Y. Jan. 17, 2023); *see also Cerovene, Inc. v. Fukuzyu Pharm. Co.*, No. 24-cv-00464 (RA), 2024 WL 5428973, at *2 (S.D.N.Y. Oct. 2, 2024) ("[C]onclusory statements that documents contain confidential business information are insufficient to justify sealing." (quoting *SET Cap. LLC v. Credit Suisse Grp. AG*, No. 18-cv-02268 (AT), 2023 WL 1961280, at *1 (S.D.N.Y. Feb. 13, 2023)).  Accordingly, the Court will unseal the Ameriprise Policy and references thereto.

## II.     Documents Filed Under Seal by Audatex

Audatex also filed a number of documents under seal.  *See generally* Rogers Decl. (attaching 44 exhibits, 25 of which are filed under seal); Second Rogers Decl. (attaching four additional exhibits under seal).  It has provided a specific justification for just one: Audatex seeks to apply redactions to two lines of a deposition transcript that Ameriprise filed, comprising testimony about confidential settlement agreements of unrelated litigations.  Dkt. 137 at 1 (identifying transcript filed at Dkt. 133-45).  The Court has reviewed the transcript and agrees with the redactions applied, and therefore the transcript may remain under seal as filed.

The remaining documents are on different footing.  Audatex filed certain of these documents under seal based on its understanding that Ameriprise and American Family wanted it to do so, without itself taking any position on the propriety of that sealing.  *See* Dkts. 123, 142. And indeed, Ameriprise asks that Exhibits 21, 24, 36, and 38 of the Rogers Declaration remain under seal, because they reflect either privileged litigation strategy and analysis or bank statements.  *See* Dkt. 138 at 1-2.  In addition, American Family asks that Exhibit 22 of the

23

Rogers Declaration, Exhibit 54 of the Second Rogers Declaration, and certain portions of Exhibit 45 of the Second Rogers Declaration be kept under seal because they contain attorney-client privileged information.  *See* Dkt. 150.  The Court has reviewed these documents and agrees with these designations; for the same reasons discussed above regarding privileged communications and sensitive business information, the Court will maintain these documents under seal.  However, American Family has identified only portions of Exhibit 45 of the Second Rogers Declaration that it believes should be sealed, *see* Dkt. 150 at 4, and Audatex has not filed a public copy of that exhibit applying those redactions.  It must do so.  *See, e.g.*, *SEC v. Telegram Grp. Inc.*, No. 19-cv-09439 (PKC), 2020 WL 3264264, at *1 (S.D.N.Y. June 17, 2020) ("[S]ealing should be 'narrowly tailored,' and redacting sensitive information is a preferable alternative to sealing an entire document." (citation omitted) (quoting *Lugosch*, 435 F.3d at 124)).  Ameriprise also asks that Exhibit 12 of the Rogers Declaration remain under seal — this is a copy of the Ameriprise Policy filed by Audatex.  Again, the Court's previous analysis applies, and Dkt. 131-4 shall be unsealed.

Ameriprise has apparently withdrawn its position regarding several of the remaining documents that Audatex filed under seal.  *See* Dkt. 138 at 2-3 (stating that Ameriprise "does **not** contend that [Exhibits 31, 33, 34, 35, and 37 of the Rogers Declaration] should remain under seal"); *see also* Dkts. 131-15, 131-17, 131-18, 131-19, 131-21.  Audatex did not provide any other basis or explanation for these designations or file any corresponding redacted copies of those exhibits on the docket.  The same is true for Exhibits 5, 7, 8, 12, 19, 20, 23, 26, 27, 29, 30, 32, 39, 40, and 41 of the Rogers Declaration, and Exhibits 52 and 53 of the Second Rogers Declaration, *see* Dkts. 131-1, 131-2, 131-3, 131-5, 131-6, 131-9, 131-11, 131-12, 131-13, 131-14, 131-16, 131-23, 131-24, 131-25, 145-2, 145-3, all of which Audatex filed under seal without any purported basis or justification.  It is not the Court's duty to craft that justification for the

parties. *Emigrant Bank*, 2025 WL 3140423, at *2 ("[T]he burden of justifying sealing rests with the party seeking sealing."). Therefore, these documents must be unsealed.

## CONCLUSION

For all the foregoing reasons, Audatex's motion for summary judgment is GRANTED, and Ameriprise's motion for summary judgment is DENIED as moot.

The various motions to seal are GRANTED in part and DENIED in part, as set forth above. In connection with those motions, within **one week** of this Order:

- Ameriprise must publicly file a redacted version of Exhibit 53 of the Raiter Declaration, currently filed at Dkt. 121; and

- Audatex must file a public version of Exhibit 45 of the Second Rogers Declaration, currently filed at Dkt. 145-1, redacted in accordance with American Family's proposed designations, *see* Dkt. 150 at 4.

The Clerk of Court is respectfully directed to unseal the following documents: Dkts. 114, 131-1, 131-2, 131-3, 131-4, 131-5, 131-6, 131-9, 131-11, 131-12, 131-13, 131-14, 131-15, 131-16, 131-17, 131-18, 131-19, 131-21, 131-23, 131-24, 131-25, 145-2, and 145-3.

Furthermore, the Clerk of Court is respectfully directed to terminate the motions at Dkts. 104, 105, 123, 124, 136, 137, 142, 150, 151, and 156; enter judgment in favor of Defendant Audatex; and CLOSE this case.

Dated: July 21, 2026
New York, New York

SO ORDERED.

_____
JENNIFER L. ROCHON
United States District Judge

25